## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **THE CARTER-JONES LUMBER COMPANY** | ) | **Case No.:** |
| **601 Tallmadge Rd.** | ) | |
| **Kent, OH 44240** | ) | **Judge:** |
| | ) | |
| **CARTER LUMBER CO.** | ) | |
| **601 Tallmadge Rd.** | ) | |
| **Kent, OH 44240** | ) | |
| | ) | |
| **CARTER LUMBER OF VIRGINIA, INC.** | ) | |
| **601 Tallmadge Rd.** | ) | |
| **Kent, OH 44240** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **COMPLAINT** |
| **vs.** | ) | |
| | ) | |
| **RODNEY R. SHIPTON** | ) | |
| **282 Donation Rd.** | ) | |
| **Greenville, PA 16125** | ) | |
| | ) | |
| **BUILDERS FIRSTSOURCE, INC.** | ) | |
| **2001 Bryan Street** | ) | |
| **Suite 1600** | ) | |
| **Dallas, TX 75201** | ) | |
|    **SERVE:** | ) | |
|     **The Corporation Trust Company** | ) | |
|     **1209 Orange St.** | ) | |
|     **Wilmington, DE 19801** | ) | |
| | ) | |
| **JOHN DOES 1 through 5** | ) | **JURY DEMAND ENDORSED HEREON** |
| **All whose names and addresses** | ) | |
| **are currently unknown** | ) | |
| | ) | |
| **Defendants.** | ) | |

Plaintiffs The Carter-Jones Lumber Company, Carter Lumber Co., and Carter Lumber of

Virginia, Inc. (collectively "Carter"), by and through the undersigned counsel, file the within

Complaint against Defendants Rodney R. Shipton ("Shipton") and Builders FirstSource, Inc.

("BFS") (Shipton and BFS are referred to collectively as the "Defendants") based on the following grounds:

## NATURE OF THE ACTION

1.      This case involves egregious and systematic determination by BFS to surreptitiously recruit Carter's key sales employees, including Shipton himself, to unfairly compete against Carter and tortiously interfere with its existing and prospective business relationships.  BFS accomplished this by taking and then weaponizing Carter's own trade secret and confidential and proprietary business information.

2.      The allegations of this Complaint establish a concerted effort by BFS and Shipton (which began while Shipton was employed by Carter) to misappropriate Carter's trade secrets and confidential and proprietary business information for their own economic gain, all in violation of Shipton's confidentiality agreement, duties of good faith and loyalty, and state and federal trade secret laws.

3.      Carter seeks damages and injunctive relief against Shipton for: (i) breach of his confidentiality agreement; (ii) misappropriation of trade secrets in violation of the Defend Trade Secrets Act; (ii) misappropriation of trade secrets in violation of state Uniform Trade Secrets Acts; (iii) breach of duties of good faith and loyalty; (iv) tortious interference with Carter's current and prospective business relationships; (vi) unfair competition; and (vi) civil conspiracy.

4.      Carter also seeks damages and injunctive relief against BFS for: (i) misappropriation of trade secrets in violation of the Defend Trade Secrets Act; (ii) misappropriation of trade secrets in violation of state Uniform Trade Secrets Acts; (iii) tortious interference with Carter's current and prospective business relationships; (iv) tortious interference

with Carter's confidentiality agreements; (v) unfair competition; (vi) aiding and abetting; and (vii) civil conspiracy.

## THE PARTIES

5.      The Carter-Jones Lumber Company is an Ohio Corporation with its principal place of business at 601 Tallmadge Rd., Kent, OH 44240.

6.      The Carter Lumber Co. is a Pennsylvania Corporation with its principal place of business at 601 Tallmadge Rd., Kent, OH 44240.

7.      Carter Lumber of Virginia, Inc. is a Virginia Corporation with its principal place of business at 601 Tallmadge Rd., Kent, OH 44240.

8.      Carter is engaged in the interstate commerce of supplying lumber and construction materials to commercial and residential construction projects across the United States.

9.      Shipton was formerly employed by The Carter-Jones Lumber Co. and assigned to the Carter location at 7010 Geoffrey Way, Frederick, MD 21704.  Shipton is a citizen of the Commonwealth of Pennsylvania, residing at 282 Donation Road, Greenville, PA 16125.

10.      Builders FirstSource, Inc. is a Delaware corporation with its headquarters located at 2001 Bryan Street, Suite 1600, Dallas, Texas 75201, and regularly conducts business in Pennsylvania, Virginia, and Maryland, among other locations.

11.      BFS is engaged in the interstate commerce of supplying lumber and construction materials to commercial and residential construction projects across the United States and is a direct competitor to Carter.

12.      John Does 1 through 5 are identified herein as subsidiary employers of BFS and unidentified co-conspirators, the identities of which remain to be determined in discovery.

## JURISDICTION AND VENUE

13.     This Court has original subject matter jurisdiction pursuant to 28 U.S.C. §1331 and 18 U.S.C. §1836(c), the Defend Trade Secrets Act of 2016, which provides United States District Courts with original jurisdiction of civil actions brought under this section.  Further, this Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over the state statutory and common law claims arising out of the same operative facts as the federal claims.

14.     This Court has personal jurisdiction over Shipton because he is a resident living in the Western District of Pennsylvania and has engaged in conduct within Pennsylvania causing the damages described herein.

15.     This Court has personal jurisdiction over BFS because it maintains business facilities in Pennsylvania, transacts business in Pennsylvania, and has engaged in conduct within Pennsylvania causing the damages described herein.

16.     Venue is proper in this District under 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

17.     Through the expenditure of considerable effort, resources, time and money, Carter has developed commercially valuable trade secrets and confidential and proprietary information, including, but not limited to: product costs and pricing; plans and specifications on existing, pending, and prospective sales and customer opportunities; market and material information and projections; product and service information; financial data; sales performance data; and information regarding materials used by Carter in connection with its products, services, and projection of current and future market needs.  All of the forgoing are utilized by Carter to develop, maintain, and grow its business and, if misappropriated by, disclosed to, or used by Carter's competitors, would cause competitive harm to Carter.

18.     Shipton was employed with The Carter-Jones Lumber Company from February of 2013 to February of 2020 as an Outside Sales Representative assigned to Carter's Frederick, Maryland store (Store No. 463).  Shipton's sales territory included portions of Pennsylvania, Virginia, Maryland, and Washington D.C., which are serviced by the Carter Lumber Co., The Carter-Jones Lumber Company, and Carter Lumber of Virginia, Inc.

19.     As a condition of Shipton's employment with Carter, he signed a Confidentiality Agreement, promising to protect and never disclose Carter's confidential information:

> Employee also acknowledges and agrees that in the course of his or her employment with Carter Lumber, he or she may acquire or come into possession of Confidential Information that belongs to Carter Lumber.  In consideration of this offer and in consideration of continued employment with Carter Lumber, Employee agrees that he or she will never disclose, sell or reveal Carter Lumber's Confidential Information to anyone outside Carter Lumber.  Employee agrees as part of his or her covenant to maintain the confidentiality of Carter Lumber's Confidential Information at all time during Employee's employment and for an indefinite period following the end of the Employee's employment.

> "Confidential Information" (whether referring to a prior Employer's Confidential Information or Carter Lumber's Confidential Information) includes but is not limited to the following: (1) trade secrets, proprietary information, information not ordinarily known by non-company personnel, including customer lists, supplier lists, trade secrets, channels of distribution, pricing policy and records, inventory records and all other information normally understood to be confidential or otherwise designated as such by Carter Lumber and (2) trade secrets, proprietary information, information not ordinarily known by non-company personnel including customer lists, suppliers lists, trade secrets, channels of distribution, pricing policy and records, inventory records, and all other information normally understood to be confidential or otherwise designated as such by any previous Employer or by Carter Lumber.

> A copy of Shipton's Confidentiality Agreement is attached as Exhibit 1.

20.     Shipton reaffirmed and acknowledged the above confidentiality obligations by signing a second Confidentiality Agreement on March 21, 2013, a copy of which is attached as Exhibit 2.

21.     Shipton also received a copy of the Carter Employee Handbook, which further emphasized his obligation to protect Carter's confidential business information:

### *Non-Disclosure/Confidentiality*

The protection of confidential business information and trades secrets is vital to the interests and success of The Carter Lumber Company. "Confidential Information" includes but is not limited to the following: (1) trade secrets, proprietary information, information not ordinarily known by non-company personnel, including customer lists, supplier lists, trade secrets, channels of distribution, pricing policy and records, inventory records, and all other information normally understood to be confidential or otherwise designated as such by Carter Lumber and (2) trade secrets, proprietary information, information not ordinarily known by non-company personnel, including customer lists, suppliers lists, trade secrets, channels of distribution, pricing policy and records, inventory records, and all other information normally understood to be confidential or otherwise designated as such by any previous Employer or by Carter Lumber.

Employees who improperly use or disclose trade secrets or confidential business information will be subject to disciplinary action, including termination of employment and legal action, even if they do not actually benefit from the disclosed information.

22.     Attached as Exhibit 3 is Shipton's February 6, 2013 acknowledgment of receipt of the Carter Employee Handbook.

23.     Although Shipton was assigned to Carter's Frederick, Maryland location, he largely worked remotely from his home in Greenville, Pennsylvania via the cell phone and laptop issued by Carter.

24.     As an Outside Sales Representative ("OSR"), Shipton was responsible for identifying target customers, increasing and maintaining Carter's market share, and servicing the needs of customers by pricing projects and selling lumber and building materials.

25.     Shipton's net sales for Carter in 2019 exceeded $20 million.

26.     In his capacity as an OSR, Shipton had access to, and did access, Carter's highly confidential and proprietary trade secrets and business information relating to, among other things:

Carter's costs, pricing and product information; customer preferences; profit margins; budgets; current and prospective customers; customer contact information; marketing strategies; market opportunities; and Carter's salesperson performance information.

27.    Shipton was one of a handful of Carter OSRs that were provided a subscription to the "Random Lengths Lumber Reports" service and received access to proprietary weekly reports sent to Carter for tracking lumber market rates.

28.    Shipton unexpectedly quit his employment with Carter without notice on February 3, 2020 – the day before he was supposed to have an important meeting with Carter's Area Sales Manager, Andy Smith, to discuss his current projects and progress.

29.    Shipton immediately began employment with BFS in an identical sales position.

30.    While Shipton's resignation was abrupt, his scheme to leave Carter and join BFS was well-planned and executed over the months leading up to his exit.

31.    Shipton's cell phone records show he first had discussions with BFS's Market Manager and Area Vice President, Conrad LaBossiere, on November 15, 2019.  This was the same day Andy Smith informed Shipton of increased oversight and changes in sales management processes intended to boost Shipton's profit margins and productivity.  See email at Exhibit 4.

32.    Shipton's cell phone records show he spoke with Conrad LaBossiere a second time on December 2, 2019.

33.    According to GPS data within the cellular phone records for Shipton's company cell phone, on December 5, 2019, Shipton traveled from Frederick, Maryland to Culpeper, Virginia. The records indicate he spent 25 minutes in Culpeper and then traveled back to Frederick, Maryland. According to his business card, Conrad LaBossiere's office is located at the BFS Culpeper Yard.

34. During the same time period, BFS was surreptitiously recruiting another Carter OSR from the same region, Terry Flaherty; Terry Flaherty abruptly quit his job at Carter on January 17, 2020 and immediately began working at BFS in a similar capacity.

35. Soon after Shipton's call with Conrad LaBossiere on December 2, 2019, Shipton and Terry Flaherty began speaking on the phone numerous times a day and virtually every day.

36. These calls between Shipton and Terry Flaherty started on December 5 and through January 17, 2020 (the day Terry Flaherty quit) occurred no less than 49 times for a total duration of 758 minutes (or twelve hours and 38 minutes). By contrast, there are no records of calls between Shipton and Terry Flaherty before December 5, 2019.

37. The calls between Shipton and Terry Flaherty continued even after Terry Flaherty began working at BFS, and while Shipton continued to be actively employed by Carter.

38. While still employed by Carter, Shipton amassed a multitude of Carter's confidential business and trade secret information and sent that information from his Carter email account to his personal Yahoo email, including customer bids, product pricing and margins, customer project information, sales and budget reports, and pending and prospective sales opportunities.

39. Between January 2 and January 27, 2020, Shipton emailed multiple documents related to customer bids, estimates, project plans and/or customer orders.

40. On January 7, 2020, Shipton emailed from his Carter account to his personal Yahoo account the 2020 Regional Salesperson Report, containing the names of Carter's outside sales representatives, their corresponding sales to date, budgets, and profit margins.

41. On January 20, 2020, Shipton emailed from his Carter account to his personal Yahoo account the 2019 annual sales information for all Carter's Outside Sale Representatives in

his area, containing the names of Carter's sale representatives, monthly sales, yearly sales, sales goals, profit margin goals, and other performance metrics.

42.     On January 27, 2020, Shipton emailed from his Carter account to his personal Yahoo account a list of Carter's key customers, containing customer business names, individual customer contacts, telephone numbers for each individual customer contact, and email addresses for each individual customer contact.

43.     On January 27, 2020, Shipton also emailed from his Carter account to his personal Yahoo account a customer list of past due sales, identifying delinquent sales accounts, customer balance aging details, customer names, and assigned salespersons.

44.     Shipton forwarded a total of 183 email messages from his Carter account to his personal Yahoo account during the period from December 2, 2019 (the date Shipton had the second call with Conrad LaBossiere) to February 3, 2020 (when Shipton quit his employment at Carter). All of these messages contained valuable proprietary, confidential and/or business data and trade secret information belonging to Carter.

45.     Shipton had no legitimate business reason or justification to forward Carter's confidential business data and trade secret information to his personal Yahoo email account.

46.     When he quit, Shipton turned over his company issued cell phone.  Prior to doing so, he wiped most of the data, including all text messages, from the cell phone.

47.     Carter was able to restore some text messages from Shipton's company cell phone, and there were messages indicating that he notified some of Carter's customers about his plans to leave Carter for BFS.

48.     In addition to wiping his phone, Shipton deleted large amounts of data from Carter's OneDrive online SharePoint system on January 30, 2020.  See SharePoint deletion notice attached as <u>Exhibit 5</u>.

49.     Shipton's cell phone records show that on the same day he deleted his SharePoint files, he spoke with Terry Flaherty for 51 minutes.

50.     Circumstances suggest at least one of the projects Shipton was ostensibly pricing on behalf of Carter was diverted to BFS while he was employed by Carter or that the confidential business and trade secret information that Shipton had compiled were used by Shipton and/or BFS to compete against Carter.

51.     In particular, one key project worth over a million dollars, referred to as "Eckington Park," was bid by Shipton on behalf of Carter beginning January 7, 2020, with final revised requirements submitted to the customer on or about January 28, 2020.  See emails at <u>Exhibit 6</u>.

52.     Shipton contracted Carter's third-party estimating service, Boise Cascade, at Carter's cost, to create an initial estimate for the "FRT" materials for the Eckington Park project. See emails at <u>Exhibit 7</u>.

53.     Shipton forwarded several versions of Carter's Eckington Park bid information to his personal Yahoo account on January 31, 2020, including the FRT estimate received from Boise Cascade.  See emails at <u>Exhibit 8</u>.

54.     Further, on January 28, 2020, the Eckington Park customer also sent Shipton an email referencing a "Supplier Agreement."  See emails at <u>Exhibit 9</u>.  As an established supplier with this customer, no such agreement would have been necessary.

55.     When he went to work for BFS, Shipton thus had every detail of Carter's Eckington Park project bid, pricing, materials, and margins, which information was easily accessible to him through his personal Yahoo account.

56.     On February 7, 2020, Carter received notice by telephone that it had been awarded the Eckington Park project, but shortly after, was told there had been a mistake and the job was still under review.

57.     On February 9, 2020, Andy Smith, Carter's Area Sales Manager, was notified by the customer that the Eckington Park project had not been awarded to Carter.  See email at Exhibit 10.

58.     Carter subsequently received information from individuals within the supply chain claiming Shipton and BFS had been awarded the bid for the Eckington Park project at BFS.

59.     Carter has since confirmed that BFS is supplying materials for the Eckington Park project.

## COUNT ONE
## Breach of Confidentiality Agreement
## (Shipton)

60.     Carter incorporates by reference each of the above allegations of the Complaint and further states.

61.     Shipton agreed he would never disclose, sell, or reveal Carter's confidential information to anyone outside Carter and that he would maintain the confidentiality of Carter's confidential information at all time during his employment and for an indefinite period following the end of his employment.  Exhibits 1 and 2.

11

62.     Shipton breached his confidentiality agreement by disclosing and revealing Carter's confidential information to BFS, both during and after his employment with Carter, and by misusing Carter's confidential information to benefit his new employer, BFS.

63.     Carter has been damaged as a direct and proximate result of Shipton's breach of his confidentiality agreement in an amount exceeding $75,000.00, to be determined at trial.

**COUNT TWO**
**Violations of the Defend Trade Secrets Act**
**(All Defendants)**

64.     Carter incorporates by reference each of the above allegations of the Complaint and further states.

65.     Shipton possesses valuable trade secrets and highly confidential and proprietary business information used by Carter in its business operations, and was provided access to, and did access, trade secret and confidential business information that is protected by the Defend Trade Secrets Act while working for Carter, including, but not limited to: costs, pricing and product information; customer preferences; profit margins; budgets; current and prospective customers; customer contact information; marketing strategies; market opportunities; and salesperson performance information.

66.     All such trade secrets and confidential business information are subject to reasonable efforts by Carter to maintain their secrecy, have independent economic value, are confidential and not publicly known or available, and are extremely proprietary to Carter.

67.     Carter's trade secrets and confidential business information are not generally known to, and not readily ascertainable by proper means by, other persons who could obtain economic value from their disclosure or use.

68.     Carter's trade secrets and confidential business information derives independent economic value by not being accessible through proper means by competitors, which can profit from its use or disclosure.  Carter has spent significant financial and human resources to develop and maintain its trade secrets and confidential business information, which is of great value to any competitor of Carter.

69.     Carter has implemented adequate measures under the circumstances to maintain the secrecy of this information, including requiring employees, like Shipton, to sign offers of employment which include confidentiality language expressly prohibiting the use and disclosure of such information outside of Carter.

70.     Defendants' misappropriation of Carter's trade secrets and confidential business information violates the Defend Trade Secrets Act, 18 U.S.C. §1836, entitling Carter to damages for the actual losses and unjust enrichment caused by the misappropriation of its trade secrets and confidential business information in an amount exceeding $75,000.00 to be determined at trial.

71.     Defendants' misappropriation of Carter's trade secrets and confidential business information was willful and malicious, entitling Carter to an award of punitive or exemplary damages.

### COUNT THREE
### Violations of State Uniform Trade Secrets Acts
### (All Defendants)

72.     Carter incorporates by reference each of the above allegations of the Complaint and further states.

73.     Carter's costs and pricing information, project bids, customer preferences, profit margins, budgets, product information, current and prospective customers, contact information, marketing strategies, market opportunities, salesperson performance information, and other

confidential, proprietary, and business information are trade secrets subject to protection under the Ohio, Pennsylvania, Maryland, and Virginia Uniform Trade Secrets Acts, Ohio R.C. §1333.61, *et seq.*, 12 Pa. Stat. Ann. §5301 *et seq.*, Md.Code Ann., Com. Law §11-1201, *et seq.*, and Va.Code Ann. §59.1-336, *et seq.*   All such trade secrets and confidential information are subject to reasonable efforts to maintain their secrecy, have independent economic value, are confidential, are not publicly known or available, and are extremely proprietary to Carter.

74.     Carter's trade secrets and confidential business information are not generally known to, and not readily ascertainable by proper means by, other persons who could obtain economic value from their disclosure or use.

75.     Carter's trade secrets and confidential business information derive independent economic value by not being accessible through proper means by competitors, which can profit from its use or disclosure.  Carter has spent significant financial and human resources to develop and maintain its trade secret and confidential business information, which is of great value to any competitor of Carter.

76.     Carter has taken adequate measures under the circumstances to maintain the secrecy of this information, including requiring employees, like Shipton, sign offers of employment which includes confidentiality language expressly prohibiting the use and disclosure of such information outside of Carter.

77.     Defendants have misappropriated Carter's trade secrets and confidential business information by improper means, by use of a computer or computer network without authority, by breach of a duty or inducement of a breach of duty to maintain secrecy, and/or by espionage through electronic or other means.

14

78.     Defendants know, or have reason to know, Carter's trade secrets and confidential business information have been acquired by improper means, have been disclosed and utilized without the express or implied consent of Carter, and were acquired or derived from or through a person while under a duty to maintain the secrecy of Carter's trade secret and confidential business information or under circumstances which gave rise to a duty of secrecy.

79.     Defendants have unjustly benefitted, or will unjustly benefit, from the misappropriation of Carter's trade secrets and confidential business information.

80.     Defendants' misappropriation of Carter's trade secrets and confidential business information violates the Uniform Trade Secrets Acts of Ohio, Pennsylvania, Maryland, and Virginia, entitling Carter to damages for the actual losses and unjust enrichment caused by the misappropriation of its trade secrets and confidential business information in an amount exceeding $75,000.00 to be determined at trial.

81.     Defendants' misappropriation of Carter's trade secrets and confidential business information was willful and malicious, entitling Carter to an award of punitive or exemplary damages and attorney's fees.

**COUNT FOUR**
**Injunctive Relief**
**(All Defendants)**

82.     Carter incorporates by reference each of the above allegations of the Complaint and further states.

83.     Shipton owed Carter a duty by contract, statute, and at common law to refrain from using, disclosing, or otherwise misappropriating Carter's trade secrets and confidential business information.  Shipton breached that duty when he misappropriated, used, and/or disclosed, or will

inevitably use and/or disclose, Carter's trade secrets and/or confidential business information by directly competing against Carter on behalf of BFS.

84.    BFS now employs Shipton in a nearly-identical role to the one he held with Carter, serving the same geographic territory, while in possession of the trade secrets and confidential business information to which he was privy while employed by Carter.

85.    Carter's goodwill and current and prospective customer relationships will be irreparably harmed by the misuse and disclosure of Carter's trade secrets and confidential business information.

86.    Carter has suffered and will continue to suffer economic damages as a result of Defendants' misappropriation of Carter's trade secrets and confidential business information, the amount of which is unascertainable at this time.

87.    Carter has no adequate remedy at law.

88.    The issuance of an injunction will promote the public interest by preserving the status quo and allowing Carter to continue its customer relationships, as well as, safeguarding commercial trade secrets and confidential business information in both intrastate and interstate commerce.

89.    Carter is entitled to injunctive relief against the retention and misuse of its trade secrets and confidential business information that were obtained in violation of the Defend Trade Secrets Act (18 U.S.C. §1836) and the Uniform Trade Secrets Acts of Ohio (Ohio R.C. §1333.62), Pennsylvania (12 Pa. Stat. Ann. §5303), Maryland (Md.Code Ann., Com. Law §11-1202), and Virginia (Va.Code Ann. §59.1-337).

**COUNT FIVE**
**Tortious Interference with Contractual and Business Relationships**
**(All Defendants)**

90.     Carter incorporates by reference each of the above allegations of the Complaint and further states.

91.     In his position as an OSR, Shipton was responsible for identifying target customers, increasing and maintaining Carter's market share, and servicing the needs of Carter's customers.

92.     Defendants acted purposefully and with improper means to harm Carter's existing and prospective business relationships, without privilege or justification, and have caused and will continue to cause Carter to lose customer sales and sales opportunities.

93.     In the absence of Defendants' interference, there was a reasonable likelihood that the prospective business relationships would have progressed to a contractual relationship.

94.     Carter has been damaged as a direct and proximate result of Defendants' tortious interference with its existing and prospective business relationships in an amount exceeding $75,000.00, to be determined at trial.

95.     Defendants' tortious interference was willful and malicious, entitling Carter to an award of punitive or exemplary damages and attorney's fees.

**COUNT SIX**
**Tortious Interference with Contractual Relationships**
**(BFS)**

96.     Carter incorporates by reference each of the above allegations of the Complaint and further states.

97.     Shipton signed a confidentiality agreement with Carter in which Shipton agreed he would never disclose, sell, or reveal Carter's confidential information to anyone outside Carter and that he would maintain the confidentiality of Carter's confidential information at all times during

his employment and for an indefinite period following the end of his employment. <u>Exhibits 1 and 2</u>.

98.    BFS acted purposefully and with improper means to interfere in Carter's employment relationship with its employees, inducing Shipton and others to terminate their employment relationship with Carter, without privilege or justification.

99.    BFS acted purposefully and with improper means to interfere with the confidentiality agreement between Carter and Shipton and to induce Shipton to breach his confidentiality agreement with Carter, without privilege or justification, both while Shipton was employed by Carter and after Shipton went to work for BFS.

100.   Carter has been damaged as a direct and proximate result of BFS' tortious interference with Carter's employment relationships and with the confidentiality agreement with Shipton in an amount exceeding $75,000.00, to be determined at trial.

101.   BFS' tortious interference was willful and malicious, entitling Carter to an award of punitive or exemplary damages and attorney's fees.

### COUNT SEVEN
### <u>Breach of the Duty of Good Faith and Loyalty</u>
### <u>(Defendant Shipton)</u>

102.   Carter incorporates by reference each of the above allegations of the Complaint and further states.

103.   As an employee of Carter, Shipton owed Carter a fiduciary duty of loyalty and duty of good faith which required him to act in the Carter's best interests.

104.   Shipton breached his duty of loyalty and duty of good faith by misappropriating, using, and disclosing Carter's trade secrets and confidential business information including, but not limited to: costs, pricing and product information; current customer project bids; customer

preferences; profit margins; budgets; current and prospective customer lists; customer contact information; marketing strategies; market opportunities; and salesperson performance data.

105.     Shipton breached his duty of loyalty and duty of good faith while still employed by Carter by soliciting Carter's customers to inform them of his departure from Carter to BFS, diverting projects to BFS, and by sending Carter's trade secrets and confidential business information to his personal email address for the use and benefit of BFS, a direct competitor to Carter.

106.     Shipton violated his duty of loyalty and duty of good faith to Carter by endeavoring to compete with Carter by, among other things, interfering with Carter's existing and prospective business relationships to Carter's detriment.

107.     Carter has been damaged as a direct and proximate result of Shipton's breach of his duties of loyalty and good faith owed to Carter in an amount exceeding $75,000.00, to be determined at trial.

108.     Shipton's actions were calculated to harm Carter in its business affairs and were intentional, willful, wanton, malicious, and reckless, entitling Carter to punitive damages.

### COUNT EIGHT
### Unfair Competition
### (All Defendants)

109.     Carter incorporates by reference each of the above allegations of the Complaint and further states.

110.     Defendants have misappropriated Carter's trade secrets and confidential business information to interfere with Carter's current and prospective customer relationships, to improperly solicit Carter's employees, to gain a competitive advantage over Carter by illicit means,

and to cause economic harm to Carter within the Pennsylvania, Maryland, Virginia, and District of Columbia markets.

111.    Defendants' actions are characterized by dishonesty and unfairness.

112.    Carter has been damaged as a direct and proximate result of Defendants' unfair competition in an amount exceeding $75,000.00, to be determined at trial.

113.    Defendants' actions were calculated to harm Carter in its business affairs and were intentional, willful, wanton, malicious, and reckless, entitling Carter to punitive damages.

## COUNT NINE
## Civil Conspiracy
## (Against All Defendants)

114.    Carter incorporates by reference each of the above allegations of the Complaint and further states.

115.    Defendants have conspired together in a malicious combination for a common purpose to do an unlawful act or to do a lawful act by unlawful means for the unlawful purpose of causing injury to Carter through misappropriation of trade secrets, tortious interference, unfair competition, and the other tortious acts as set forth above.

116.    Defendants committed overt acts in furtherance of their common purpose to harm and damage Carter and have conspired in a way not competent for one acting alone, causing actual damages to Carter.  These overt acts include the misappropriation of Carter's trade secrets and confidential business information by Shipton, BFS, and the John Does while Shipton was employed by Carter and after Shipton became employed by BFS, for the purpose of stealing Carter's current and prospective customer business opportunities and targeted solicitation of Carter's other OSRs.

117.    Defendants' civil conspiracy was and is characterized by malice and was committed with an intent to harm Carter in a conscious disregard for the rights of Carter.

118.    As a direct and proximate cause of Defendants' civil conspiracy, Carter has suffered and continues to suffer damages in an amount exceeding $75,000.00, to be determined at trial.

## COUNT TEN
### Aiding and Abetting a Breach of Duty of Loyalty
### (Against Defendant BFS and John Does)

119.    Carter incorporates by reference each of the above allegations of the Complaint and further states.

120.    BFS and the John does knew or had reason to know that Shipton owed an obligation of confidentiality to Carter by reason of his confidentiality agreement and that Shipton owed a duty of loyalty and good faith to Carter.

121.    BFS and the John Does substantially assisted, directed, participated in, and/or encouraged Shipton to breach his confidentiality agreement with Carter.

122.    BFS and the John Does substantially assisted, directed, participated in, and/or encouraged Shipton to breach the duty of loyalty and duty of good faith owed to Carter.

123.    BFS and the John Does benefited from Shipton's breach of his confidentiality agreement and breach of the duties of loyalty and good faith owed to Carter and those benefits allowed BFS to misappropriate Carter's confidential business and trade secret information, to tortuously interfere in Carter's business relationships and opportunities, and to unfairly compete against Carter.

124.    Carter has been damaged as a direct and proximate result of BFS' and the John Does' aiding and abetting Shipton in his breach of his confidentiality agreement and duties of loyalty and good faith owed to Carter in an amount to be determined at trial.

125.    BFS' and the John Does' actions were calculated to harm Carter in its business affairs and were intentional, willful, wanton, malicious, and reckless, entitling Carter to punitive damages.

**WHEREFORE**, Plaintiffs The Carter-Jones Lumber Company, Carter Lumber Co., and Carter Lumber of Virginia, Inc. (collectively "Carter") respectfully request this Court grant the following relief against Defendants Rodney R. Shipton ("Shipton") and Builders FirstSource, Inc. ("BFS"):

a.    An award of compensatory damages in an amount exceeding $75,000.00, to be determined at trial.

b.    An award of punitive or exemplary damages in an amount exceeding $75,000.00, to be determined at trial.

c.    Preliminary and permanent injunctive relief enjoining Defendants and ordering that: Defendant Shipton shall keep confidential, and shall not disclose to anyone or use in any way, any of the trade secrets or confidential information he removed from Carter, or to which he had access during his employment with Carter;  Defendant BFS shall cease use in any way of Carter's trade secrets or confidential information it acquired from Defendant Shipton; Defendant BFS shall preserve without alteration and immediately return to counsel for Carter the original and all copies of Carter's trade secrets and confidential business information, regardless of the form (hard copy or electronically stored) or present location of such items; and, Defendant Shipton shall be barred from working for Defendant BFS in a position similar to his prior position with Carter or within the geographic region he served during his employment with Carter; and

d.      An award of all costs and expenses proximately associated with this action including its reasonable attorneys' fees;

e.      For such other relief as the Court may deem just and proper.

Respectfully submitted,

*/s/ Todd A. Harpst*
Todd A. Harpst (Pa ID. 79821)
Nicholas J. Horrigan (OH 0087345)
Harpst Becker LLC
1559 Corporate Woods Parkway, Ste. 250
Uniontown, OH 44685
(330) 983-9971
(330) 983-9981 (fax)
tharpst@harpstbecker.com
nhorrigan@harpstbecker.com

*Counsel for Plaintiffs*
*The Carter-Jones Lumber Company*
*Carter Lumber Co.*
*Carter Lumber of Virginia, Inc.*

## JURY DEMAND

Plaintiffs demand a trial by jury of the maximum number permitted by law.

*/s/ Todd A. Harpst*
Todd A. Harpst (Pa ID. 79821)